UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBBIE POWELSON,<br><br>  Plaintiff,<br><br>  v.<br><br>SAUSALITO POLICE DEPARTMENT, et al.,<br><br>  Defendants. | Case No. 23-cv-01360-EMC<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Docket No. 71 |

  Plaintiff Robert Powelson, proceeding pro se, has filed suit against the City of Sausalito and several of its employees (collectively, "Defendants").[1] The suit concerns Defendants' responses to Mr. Powelson's conduct and activities related to a homeless encampment, first located at Dunphy Park and later Marinship Park in Sausalito. Now pending before the Court is Defendants' motion for summary judgment. Having considered the parties' briefs and accompanying submissions, as well as the oral argument presented at the hearing on August 28, 2025, the Court hereby **GRANTS** Defendants' motion.

---

[1] The individual defendants are all police officers: Corp. Mathers, Sgt. Georges, Officer Mitchell, Corp. White, Officer Smgalski, Officer Rose, Lt. Gregory, Chief Rohrbacher, Sgt. Vereios, and Capt. Fraass. In a prior order, the Court noted that Sgt. Vereios and Capt. Fraass were not named as defendants in either the caption of the complaint or in the section that discusses the named defendants. However, they were later specified as defendants in Counts 3 and 4. *See* Docket No. 40 (Order at 2).

  In his original complaint, Mr. Powelson also sued the United States Army Corps of Engineers ("USACE") and one of its employees. Those defendants, however, are no longer in the case because Mr. Powelson voluntarily dismissed them in September 2023. *See* Docket No. 36 (notice).

## I.    FACTUAL & PROCEDURAL BACKGROUND

The operative complaint is the first amended complaint ("FAC"). In August 2023, Defendants moved to dismiss the claims that were asserted against them, which were Counts 3-12 of the FAC. *See* Docket No. 23 (motion). In November 2023, the Court granted in part and denied in part the motion to dismiss. The Court's order allowed Mr. Powelson to proceed with only certain claims.

- **Claims related to the arrest of Mr. Powelson on June 29, 2021 (Sgt. Vereios, Lt. Gregory, and Capt. Fraass).** This was the day that the City closed the encampment at Dunphy Park and relocated it to Marinship Park. Mr. Powelson was arrested for obstruction, inciting a riot, and illegal camping.
    - Count 3 – false arrest. The Court held there was probable cause to arrest Mr. Powelson for obstruction. However, "[t]o the extent Mr. Powelson was arrested for inciting a riot and illegal camping (as opposed to obstruction), qualified immunity has not been established. This claim remains viable, although the City Defendants are not barred from raising qualified immunity at a later stage." Docket No. 40 (Order at 24).
    - Count 4 – First Amendment retaliation. Consistent with the above, the Court held there was probable cause to arrest for obstruction, but it allowed the claim to proceed to the extent Mr. Powelson was arrested for inciting a riot and illegal camping. *See* Docket No. 40 (Order at 24).
- **Claims related to the arrest of Mr. Powelson on November 23, 2021 (Sgt. Georges, Corp. White, and Officer Smgalski).** On this day, Mr. Powelson and others set up a camp in Vina Del Mar Park, located in downtown Sausalito, allegedly to protest the conditions in Marinship Park. Mr. Powelson was arrested after he allegedly tried to de-escalate a confrontation between the police and another camper, Holly Wild.
    - Count 7 – unlawful seizure and false arrest.
    - Count 8 – First Amendment retaliation.

- **Claims related to a confrontation with the police on March 15, 2022 (Officer Rose).** During this incident, the police were allegedly trying to use parking tickets that had been issued against Mr. Powelson as a reason to impound his truck so that he could not record a purported raid on the Marinship Park camp. (Mr. Powelson was appealing the issuance of the parking tickets.) When Mr. Powelson tried to take pictures of paperwork that the parking enforcement officer had filled out, a police officer allegedly tackled him.
    - Count 9 – First Amendment retaliation.
    - Count 10 – excessive force.
- **Claim related to parking tickets (Corp. Mathers and Mr. Holt).**
    - Count 11 – violation of procedural due process. The Court dismissed Count 11 to the extent that Mr. Powelson was challenging an adjudicatory scheme related to parking tickets of which the City (including its employees) was not a part. *See* FAC ¶ 134 (alleging that the superior court declined to hear his appeal of the traffic referee's decision on the basis that "all appeals must be authorized by state statute, and . . . there was no state statute for an appeal on the traffic referee[']s ruling"); FAC ¶ 136 (alleging that he was "deprived of [the] right to cross examine and confront witnesses, . . . subpoena evidence . . . , and other basic provisions of law"). The Court dismissed only "this specific part of Count 11 ([but] not the remainder . . . )." Docket No. 40 (Order at 23).

## II.     DISCUSSION

A.     Legal Standard

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a

3

1  scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could
2  reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence
3  must be viewed in the light most favorable to the nonmoving party and all justifiable inferences
4  are to be drawn in the nonmovant's favor. See id. at 255.

5  Where a defendant moves for summary judgment based on a claim for which the plaintiff
6  bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a
7  showing sufficient to establish the existence of an element essential to [the plaintiff's] case."
8  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

B. <u>Voluntarily Dropped Claims</u>

    1. <u>Claims Related to the Arrest of Mr. Powelson on June 29, 2021</u>

As noted above, the claims that survived Defendants' 12(b)(6) challenge included parts of Counts 3 and 4. These claims are related to the arrest of Mr. Powelson on June 29, 2021. Although the Court allowed parts of Counts 3 and 4 to proceed, Mr. Powelson has now voluntarily dropped these claims, as he expressly stated in his opposition. *See* Opp'n at 7 (acknowledging that Defendants moved for summary judgment on these claims but referring to the claims as "dead"; "[b]ecause the court found probable cause for the arrest, and because Plaintiff was never prosecuted for inciting a riot, there are no damages in Counts 3 & 4 greater than the arrest itself – which was itself dismissed as a cause of action"). Mr. Powelson confirmed this at the hearing.

The Court therefore dismisses what remains of Counts 3 and 4 from the suit. The Court also notes that, had Mr. Powelson not dropped the claims, they would likely be subject to dismissal for an independent reason. Specifically, because there was probable cause to arrest Mr. Powelson for obstruction, that is enough to defeat the false arrest claim; it does not matter whether there was also probable cause to arrest him for inciting a riot or illegal camping. *See Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017) ("'[P]robable cause to believe that a person has committed *any* crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause . . . .'") (emphasis in

original).[2]

### 2. Claim Related to Parking Tickets

Another claim that survived the 12(b)(6) challenge was part of Count 11. In their motion for summary judgment, Defendants erroneously claimed that Count 11 was dismissed in its entirety. However, Mr. Powelson did not object to that characterization in his opposition brief, thus indicating, at the very least, that he did not intend to pursue any remaining portion of Count 11. At the hearing on the summary judgment motion, Mr. Powelson confirmed that there was nothing to pursue in Count 11. Accordingly, to the extent any portion of Count 11 survived 12(b)(6), that portion is now dismissed as well.

### 3. Summary

Because Mr. Powelson has voluntarily dropped all that remains of Counts 3 and 4, and is not pursuing Count 11, that means the only claims that the Court has to address on the merits are those related to (1) the arrest on November 23, 2021 (Counts 7 and 8), and (2) the confrontation with the police on March 15, 2022 (Counts 9 and 10). These claims are asserted against individual defendants only (*i.e.*, not the City).

## C. Claims Related to the Arrest of Mr. Powelson on November 23, 2021

In Counts 7 and 8, Mr. Powelson asserts claims for unlawful seizure, false arrest, and First Amendment retaliation. Lack of probable cause is an element of each of these claims.[3]

---

[2] False arrest and malicious prosecution are treated differently. *See Rivera-Guadalupe v. City of Harrisburg*, 124 F.4th 295, 303 (3d Cir. 2024) (noting that "the any-crime rule . . . governs for false arrest," but, after the Supreme Court's decision in *Chiaverini v. City of Napoleon*, 602 U.S. 556 (2024), the any-crime rule does not apply to malicious prosecution); *see also Alexander v. City of Syracuse*, No. 21-3075(L), 2025 U.S. App. LEXIS 6007, at *52 (2d Cir. Mar. 14, 2025) (stating that, "unlike Fourth Amendment claims of false arrest, in the Fourth Amendment malicious prosecution context, probable cause must support *each* charge brought by the prosecution") (emphasis in original; citing *Chiaverini*).

[3] For a **false arrest**, a plaintiff must prove that he was arrested without probable cause. *See Yousefian v. City of Glendale*, 779 F.3d 1010, 1014 (9th Cir. 2015). ("The absence of probable cause is a necessary element of a § 1983 false arrest . . . claim[].");  9th Cir. Model Instruction No. 9.23 ("In order to prove the seizure in this case was unreasonable, the plaintiff must prove by a preponderance of the evidence that [he] [she] [other pronoun] was arrested without probable cause.").

A false arrest would also constitute an **unlawful seizure**. To the extent Mr. Powelson is asserting that his property (not just his person) was unlawfully seized, *see* FAC ¶ 89 (alleging that

5

1    Counts 7 and 8 are based on events that took place in Vina del Mar Park on November 23,
2   2021. Mr. Powelson has provided a video of that incident. The video is footage from a police
3   officer's body cam (specifically, Officer White's). The video shows that there were several tents
4   in the park. The police began to take the tents down (after making sure no one was in them). One
5   of the tents that was taken down belonged to Ms. Wild. When she saw the police were taking her
6   tent down, she began to argue with them, *e.g.*, telling them not to touch her things. Ms. Wild sat
7   on top of her broken-down tent – with her dog in her lap – so that it could not be taken away. Mr.
8   Powelson was present in the park and appeared to be filming the interaction between Ms. Wild
9   and the police.

10   At one point, an officer (Officer White) put Ms. Wild's arm behind her in the attempt to
11   get her to move. The same officer also seems to have asked Mr. Powelson to get the dog on Ms.
12   Wild's lap. The officer made this request more than once. Mr. Powelson approached the area
13   where Ms. Wild and the police were. It appears that, at first, Mr. Powelson was going to get Ms.
14   Wild's dog, as suggested by the fact that he bent down. However, Mr. Powelson only bent down
15   for a brief moment and then soon stood up because the officer was still pulling on Ms. Wild's arm
16   from behind. Mr. Powelson said "Stop" and "Get back" to the officer several times and put his
17   hand out, which could be taken as directed at the officer, and then the officer immediately arrested
18   Mr. Powelson. The arrest of Mr. Powelson came quickly after he said "Stop" and "Get back" and

---

tents and blankets were seized), property may be seized as incident to a lawful arrest. *See Jaa v. City of Dublin*, No. 14-cv-03260-JCS, 2014 U.S. Dist. LEXIS 201177, at *16-17 (N.D. Cal. Aug. 29, 2014) ("'The prevailing rule under the Fourth Amendment that searches and seizures may not be made without a warrant is subject to various exception,' one of which is a search or seizure incident to a lawful custodial arrest.").

As for **First Amendment retaliation**, where the claim is based on a retaliatory arrest, the plaintiff must plead and prove the absence of probable cause. *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019). "[I]f the plaintiff establishes the absence of probable cause, 'then . . . [t]he plaintiff must show that the retaliation was a substantial or motivating factor behind the [arrest], and, if that showing is made, the defendant can prevail only by showing that the [arrest] would have been initiated without respect to retaliation.'" *Id.* at 1725; *see also id.* at 1722 ("It is not enough to show that an official acted with a retaliatory motive and the plaintiff was injured – the motive must cause the injury. Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive.").

put his hand out.[4]

There is a police incident report related to the arrest of Mr. Powelson. *See* RJN, Ex. D. The report reflects Mr. Powelson was arrested for violating two provisions in the California Penal Code:

- Section 647(e) (disorderly conduct) (providing that "every person who commits any of the following acts is guilty of disorderly conduct, a misdemeanor: . . . (e) Who lodges in a building, structure, vehicle, or place, whether public or private, without the permission of the owner or person entitled to the possession or in control of it"); and

- Section 148(a)(1) (obstruction) (providing that "[e]very person who willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician . . . in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed, shall be punished by a fine . . . or by imprisonment . . . or by both that fine and imprisonment").

Defendants argue that there is no genuine dispute that there was probable cause to arrest Mr. Powelson for obstruction. The Court holds that, at the very least, the officers are protected by qualified immunity because, given the undisputed evidence as depicted in the video, a reasonable officer could have believed there was probable cause to arrest Mr. Powelson for obstruction, even if the officer was mistaken in that regard. *See Rosenbaum v. Washoe County*, 663 F.3d 1071, 1078 (9th Cir. 2011) ("[T]he question in determining whether qualified immunity applies is whether *all* reasonable officers would agree that there was *no* probable cause in this instance.") (emphasis added); *see also Sjurset v. Button*, 810 F.3d 609, 622 (9th Cir. 2015) ("[E]ven if the officers were mistaken in their belief that they could remove the children at the direction of DHS

---

[4] Mr. Powelson has sued not only the officer who initiated the arrest (Officer White) but also two others (Sgt. Georges and Officer Smgalski). Mr. Powelson sued Sgt. Georges because (as also reflected in the incident report) he later assisted in the arrest. Officer Smgalski seems to have been sued because he drove Mr. Powelson to the jail. *See* Powelson Decl. ¶ 7.

7

1  without court authorization, their actions were objectively reasonable under the circumstances.
2  Accordingly, the Stayton officers are entitled to qualified immunity.").

3        To be sure, the police did ask Mr. Powelson for help in getting the dog, and Mr. Powelson
4  did not even approach until he was asked to help (instead, he was filming the interaction between
5  the police and Ms. Wild). Also, Mr. Powelson did not do much before the police decided to arrest
6  him.

7        But even though Ms. Powelson did not do much – telling the police to "Stop" and "Get
8  back" and putting his hand out, which appeared to be in the officer's direction – arguably
9  constituted interference with the police. At 12(b)(6), the Court did not dismiss the claims based
10 on the incident because there were no allegations that Mr. Powelson physically interjected himself
11 in between Ms. Wild and the police. *See* Docket No. 40 (Order at 14). Here, the video shows that
12 Mr. Powelson arguably did interject himself. The interjection may not have resulted in physical
13 contact, but Mr. Powelson was not just being an observant bystander. A reasonable officer could
14 interpret his actions as attempting to interfere with his attempt to move Ms. Wild and that a further
15 attempt to do so could have invited physical contact with Mr. Powelson. At the very least, there is
16 a close call and, as the Court stated in its 12(b)(6) order, "'where probable cause is a close call,
17 qualified immunity becomes a factor.'"[5] Docket No. 40 (Order at 40) (quoting *Flynn v. City of*
18 *Santa Clara*, 388 F. Supp. 3d 1158, 1168 (N.D. Cal. 2019)); *see also Estate of Lopez v. Gelhaus*,
19 871 F.3d 998, 1020 (9th Cir. 2017) (noting that qualified immunity protects an officer from a
20 reasonable mistake of law or fact).

21       In his declaration, Mr. Powelson claims that he said "Stop" and "Get back" just so that he
22 could get the dog:

> As I reached out to get the dog, I asked Officer White to stop and get back so I could safely retrieve the dog. Officer [W]hite was twisting Holly Wild's arm which I thought would upset the dog and could lead it to bite me or Officer White – so telling him to stop and get back was my suggestion of how to make the situation more safe so I could get the dog.

---

[5] Qualified immunity protects only individuals, not entities. However, Counts 7 and 8 are brought against individuals only, not the City.

United States District Court
Northern District of California

Powelson Decl. ¶ 7. But Mr. Powelson leaves out the fact that, at least arguably, he reached his hand out toward the officer's direction, in saying "Stop" and "Get back" to the officer.

Because a reasonable officer could have been believed there was probable cause (even if mistaken) to believe Mr. Powelson was attempting to obstruct his enforcement of the law, the relevant officers have qualified immunity – for each of the causes of action. As noted above, probable cause is an element for each of the causes of action at issue. *See* note 3, *supra*.

Moreover, even if there were genuine disputes of fact on obstruction (such that the issue of qualified immunity based on probable cause for obstruction could not yet be resolved), that would not mean Mr. Powelson would survive summary judgment. This is because Mr. Powelson was also arrested for disorderly conduct – essentially lodging in the park without the City's permission. As discussed below, a reasonable officer could have believed that there was probable cause to arrest for disorderly conduct, even if ultimately mistaken in fact.

Mr. Powelson suggests that he could not have been properly arrested for disorderly conduct because: (1) at the time he was arrested, he was simply protesting and/or educating the public about what was going on with Marinship Park; and (2) the officers did not personally see him lodging in the park. *See, e.g.*, Powelson Decl. ¶ 8 ("The entire [time] I saw Officer White on that day, I was on my feet, video recording, and objecting – I was not lodging."). Both of these arguments are problematic.

First, the fact that Mr. Powelson was not, *e.g.*, in a tent at the time of his arrest does not demonstrate he was not still lodging in the park. Any suggestion by Mr. Powelson that he had actually not set up a tent in which to lodge – even if that *also* constituted protest activity[6] – is contrary to his complaint. In the FAC, Mr. Powelson alleges that, on November 15, 2021, he was "sleeping in his tent at Dunphy Park as part of the protest." FAC ¶ 75. Mr. Powelson and others "stayed [for a] few nights" and then moved to Robyn Sweeney Park. FAC ¶ 77. On November 22, 2021, Mr. Powelson and others "moved to a park in downtown Sausalito" – *i.e.*, Vina Del

---

[6] *See, e.g.*, Powelson Decl. ¶ 2 ("The tents['] purposes were not for living in, but rather were made to convey a message about homelessness and the sewage contamination effecting Camp Cormorant.").

9

1   Mark Park. FAC ¶ 78. The incident report also supports Mr. Powelson lodging at Vina Del Mar

2   on the day of the arrest because, hours earlier, he had been cited for violating Sausalito Municipal

3   Code § 13.28.010, which makes it unlawful for, *inter alia*,

> any person to make use of or to enter upon or refuse to fail to leave any park, parkway, recreation area, street, alley or other public land owned or controlled by the City at any time during which lands have been withdrawn from the personal access and use of members of the public, or during which such access or use has been limited in area, time or manner by resolution of the City Council, or by any officer of the City authorized by Council resolution to limit access to such lands . . . .

Sausalito Mun. Code § 13.28.010(A). "Night shift" officers had apparently cited Mr. Powelson. *See* RJN, Ex. D (incident report). Hence, there was reason for the officers to believe Mr. Powelson was lodged in the camp. Since a reasonable officer could have so believed, the officer here is entitled to qualified immunity. *See Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010) (noting that "[p]robable cause exists where the facts within the collective knowledge of law enforcement officials, derived from reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that a criminal offense has been or is being committed," but, for qualified immunity, "an officer need not have actual probable cause, but only 'arguable' probable cause", which "exists where 'reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff'").

Second, Mr. Powelson's contention that the arresting officer had to have seen him lodging in order to arrest him is not without some merit. California Penal Code § 836(a)(1) provides that an officer may arrest without a warrant if "[t]he officer has probable cause to believe that the person to be arrested has committed a public offense in the officer's presence." Cal. Pen. Code § 836(a)(1).[7] "[A] public offense is committed in the presence of an officer within the meaning of a statute such as Penal Code, § 836, when 'circumstances exist that would cause a reasonable person to believe that a crime has been committed in his presence.'" *Coverstone v. Davies*, 38 Cal. 2d

---

[7] A felony need not be committed in the officer's presence, *see* Cal. Pen. Code § 836(a)(2), but disorderly conduct under § 647(e) is a misdemeanor. *See* Cal. Pen. Code § 647.

United States District Court
Northern District of California

315, 320 (1952).

But here, a reasonable officer could have believed that a crime was committed in his presence, and not simply because of what the night shift officers had related about the citation that was issued to Mr. Powelson. Rather, a reasonable officer could have believed that a crime was committed in his presence because, hours later, Mr. Powelson was still in the park and the tents were still standing. *See* RJN, Ex. D (incident report) ("After being briefed by the aforementioned nightshift officers, a plan was decided that removing the tents was the next step if they were still standing," and "I viewed Powelson and [redacted] standing near the fountain and all of the tents were still standing."). *Cf. Dyer v. Dep't of Motor Vehicles*, 163 Cal. App. 4th 161, 173 (2008) (rejecting plaintiff's argument that arrest was unlawful because arresting officer did not personally observe him committing a misdemeanor DUI; "[w]here one officer has reasonable suspicion, based on personal observation, that a suspect may be driving while intoxicated, he may summon another officer to assist him in making the arrest," and "[b]ecause both officers participated in arresting Dyer for DUI, his arrest complied with Penal Code section 836").

The Court acknowledges that the night shift could have arrested Mr. Powelson for lodging in the park but did not do so (choosing instead just to cite him), and the immediate event that appeared to have precipitated the arrest was the obstruction. However, given that Mr. Powelson was still in the park, camping hours after the night shift, there was an arguable basis to arrest him for disorderly conduct as well, *i.e.*, even if the immediate precipitating event was the obstruction.

As noted above, under the any-crime rule, so long as there is probable cause to arrest for one crime, it does not matter whether there is probable cause to arrest for another crime. Thus, if there was a basis to arrest for illegal lodging, it does not matter whether there was also basis to arrest for obstruction. Either charge could sustain an arrest, and here qualified immunity applies to both grounds.

Accordingly, the Court grants Defendants' motion for summary judgment on all claims related to the arrest of Mr. Powelson on November 23, 2021. The officers have qualified immunity.

11

D.     Claims Related to Confrontation with Police on March 15, 2022

In Counts 9 and 10, Mr. Powelson asserts claims for First Amendment retaliation and excessive force. The claims are based on the confrontation that took place with the police on March 15, 2022. The confrontation took place at the Marinship Park parking lot. Mr. Powelson had parked his truck there and was videoing cars being seized in the lot. *See* Powelson Decl. ¶ 9. A parking enforcement officer was there to get the cars out of the lot. She had a parking enforcement vehicle – essentially, a cart with doors. Police officers were in the parking lot as well, including Officer Rose. They were there to assist the parking enforcement officer. *See* Powelson Decl., Ex. C (incident report).

The police incident report reflects that the parking enforcement officer put forms related to the towing of two cars in her vehicle, specifically, on the dashboard. Those forms had information about the persons whose cars had been towed (names and addresses). *See* Powelson Decl., Ex. C. Mr. Powelson has provided a video – footage from Officer Rose's body cam – showing that Mr. Powelson approached the vehicle, apparently trying to film or take a photo of the forms through the windshield, and Officer Rose warned him that that information was not his to have and moved the forms away from view. (In his papers and at the hearing, Mr. Powelson asserted that Officer Rose never told him not to film or take photographs of the forms, but implicitly that was the case. No reasonable jury could conclude otherwise.)

Mr. Powelson then walked away from the parking enforcement vehicle and later talked to another police officer, apparently, because the parking enforcement officer had also determined that Mr. Powelson's truck would be towed based on unpaid parking tickets.[8] Mr. Powelson was told he could move his truck instead. *See* Powelson Decl., Ex. C. After examining Mr. Powelson's truck and appearing to fill out some information on a form, the parking enforcement officer put her clipboard inside her vehicle. Mr. Powelson then came back toward the parking enforcement vehicle and approached the vehicle, which had its door open. Mr. Powelson approached the vehicle and looked as if he were trying to film or photo inside the vehicle again, at

---

[8] As indicated above, Mr. Powelson was appealing those tickets.

1  which point the police officer shoved him away from the vehicle.  (Mr. Powelson claims that he
2  was violently tackled, *see* Opp'n at 12, but the video shows that he was shoved or pushed, not
3  tackled.)

### 1. First Amendment Retaliation

For the First Amendment retaliation claim, there is qualified immunity.[9]  "When an officer claims qualified immunity, we ask '(1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct.'" *Saved Magazine v. Spokane Police Dep't*, 19 F.4th 1193, 1198 (9th Cir. 2021).  A court has discretion as to which prong to address first.  *See id.*

Here, qualified immunity obtains because it was not clearly established that Mr. Powelson was engaging in protected activity in the first place.  While there is a First Amendment right to record police activity in public, *see Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018) (stating that "[t]he First Amendment protects the right to photograph and record matters of public interest," which "includes the right to record law enforcement officers engaged in the exercise of their official duties in public places"); *see also Fields v. City of Philadelphia*, 862 F.3d 353, 355-356 (3d Cir. 2017) (stating that "the First Amendment protects the act of photographing, filming, or otherwise recording police officers conducting their official duties in public"),[10] Mr. Powelson was not filming the police and their conduct.  Rather, he was filming or taking a picture of documents inside the parking enforcement cart.  Law enforcement documents are not necessarily public (there is typically a process that must be followed to get copies of such

---

[9] As above, Counts 9 and 10 have asserted against individuals only, not the City.

[10] Consistent with these authorities, California Penal Code § 148(g) provides that

> [t]he fact that a person takes a photograph or makes an audio or video recording of a public officer or peace officer, while the officer is in a public place or the person taking the photograph or making the recording is in a place he or she has the right to be, does not constitute, in and of itself, a violation of subdivision (a) [obstruction], nor does it constitute reasonable suspicion to detain the person or probable cause to arrest the person.

Cal. Pen. Code § 148(g).

13

1    documents), and, even if they are, the documents were inside a law enforcement vehicle, and there
2    is no clearly established right to view such documents. At least Mr. Powelson has cited no
3    authority so holding.

4    In sum, Mr. Powelson has not cited any authority to support his position that his filming of
5    documents inside a law enforcement vehicle is constitutionally protected activity, a predicate to a
6    claim of retaliation. Given the lack of clearly established law on this point, the officers are
7    entitled to qualified immunity on this claim. *See Spiehs v. Armbrister*, No. 24-4005-JAR-BGS,
8    2025 U.S. Dist. LEXIS 29373, at *22-23 (D. Kan. Feb. 19, 2025) (stating that, for the First
9    Amendment retaliation claim, because of "qualified immunity, it must be clearly established that
10   Plaintiff engaged in constitutionally protected activity").

11       2.    <u>Excessive Force</u>

12   Qualified immunity also disposes of the excessive force claim.

13   As an initial matter, the Court takes note that excessive force claims are often made in the
14   context of an arrest and thus are predicated on the Fourth Amendment. *See, e.g.*, 9th Cir. Model
15   Instruction No. 9.25 ("In general, a seizure of a person is unreasonable under the Fourth
16   Amendment if a police officer uses excessive force [in making a lawful arrest] [and] [or] [in
17   defending [himself] [herself] [other pronoun] [others]] [and] [or] [in attempting to stop a fleeing or
18   escaping suspect]. Therefore, to establish an unreasonable seizure in this case, the plaintiff must
19   prove by a preponderance of the evidence that the officer[s] used excessive force."). However,
20   excessive force claims can be based on the Fourteenth Amendment, not just the Fourth
21   Amendment. The critical issue is whether there has been a seizure. If so, the Fourth Amendment
22   is implicated; if not, then the Fourteenth Amendment is. *See Puente v. City of Phoenix*, 123 F.4th
23   1035, 1050-51 (9th Cir. 2024) ("[W]hen a police application of force involves a seizure of a
24   person, we evaluate whether that force was excessive under the Fourth Amendment's objective
25   reasonableness standard. In contrast, when presented with a claim of injuries resulting from
26   alleged excessive force applied outside the context of a seizure, we apply a Fourteenth
27   Amendment substantive due process standard that asks whether the police behavior shocks the
28   conscience.") (internal quotation marks omitted).

In the instant case, Mr. Powelson was not arrested; in that regard, he was not seized. Mr. Powelson suggests that the officer's shoving constituted a seizure, but he has cited no authority to support such. At the very least, it was not clearly established, at the time of the incident, that a push or shove (by itself) constitutes a seizure. A seizure occurs where, as an objective matter, there is an intent to restrain. *See id.* at 1051 ("'[T]he appropriate inquiry is whether the challenged conduct objectively manifests an intent to restrain, for [the courts] rarely probe the subjective motivations of police officers in the Fourth Amendment context.'") (emphasis omitted). In *Puente*, the Ninth Circuit held that the "[d]efendants' use of [chemical] irritants to disperse the crowd from the Free Speech Zone does not constitute a seizure because there is no basis in the record for concluding that it was undertaken with the necessary objective intent to restrain." *Id.* at 1052. "[T]he common law consistently treated orders of 'exclusion' from a place as not satisfying the 'confinement' requirement of the tort of false imprisonment." *Id.* at 1053.

Notably, the Ninth Circuit

> add[ed] that the analysis would be different if, in the course of accomplishing such an intended dispersal or exclusion, a person uses measures that objectively aim to detain or confine another person. Thus, for example, the public librarian who, in order to accomplish the dispersal or exclusion of patrons who ignore a closing-time instruction to leave, *grabs* them and *then* pushes or throws them out has effectuated a "seizure." The same would be true if the librarian pressed the shoulder of overstaying patrons and physically escorted them to the door. In both instances, a seizure has occurred because the librarian has used measures that objectively detained or confined the patrons' movement – even if only temporarily – so that, under the librarian's control, the patrons will be moved out the door. The fact that the librarian's ultimate objective was to exclude the patrons from the premises is not normally enough, by itself, to constitute an objective intent to restrain that gives rise to a seizure.

*Id.* at 1053 (emphasis added). In the case at bar, the officer did not grab Mr. Powelson. And even if *Puente* leaves open some room for a push or shove to constitute a seizure under some circumstances (*e.g.*, as part of an effort to escort the plaintiff from one place to another), *Puente* was decided in 2024, which is after the incident at issue in this case; thus, the "clearly established law" requirement to defeat qualified immunity is lacking.

To the extent Mr. Powelson now argues that his excessive force claim should still survive

15

1   under the Fourteenth Amendment, the Court does not agree.  First, Mr. Powelson has always
2   predicated his excessive force claim on the Fourth Amendment.  Second, as indicated above, the
3   Fourteenth Amendment requires conduct that essentially shocks the conscience, and, here, Mr.
4   Powelson was not tackled, but rather shoved.  Furthermore, the officer shoved Mr. Powelson only
5   after Mr. Powelson had already been warned not to look at documents inside the law enforcement
6   vehicle.  Under these circumstances, the officer would have at the very least qualified immunity.
7   Again, there is no clearly established law that shoving a member of the public away from a police
8   vehicle after being warned not to view or photograph documents inside the vehicle shocks the
9   conscience or otherwise violates the Constitution.

### III.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted.  Because this order disposes of all claims remaining in the suit, the Court instructs the Clerk of the Court to enter a final judgment in favor of Defendants and to close the file in the case.

This order disposes of Docket No. 71.

**IT IS SO ORDERED**.

Dated: September 7, 2025

_____
EDWARD M. CHEN
United States District Judge

16